**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

_____

| | | |
|---|---|---|
| **FEDERAL DEPOSIT INSURANCE** | ) | |
| **CORPORATION AS RECEIVER FOR** | ) | |
| **NEW CITY BANK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. _____** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ALBERT BALDERMANN; MERRI** | ) | |
| **EHRENWERTH BALDERMANN;** | ) | **JURY TRIAL DEMANDED** |
| **WILLIAM BEAVERS; PETER** | ) | |
| **BILANZIC; VINCENT CAINKAR;** | ) | |
| **MICHAEL DEBRE; RONALD FISHER;** | ) | |
| **DONALD HARTZ; GLENN KRIETSCH;** | ) | |
| **RAYMOND LAZZARA; BURTON** | ) | |
| **ODELSON; THOMAS POWELL; GARY** | ) | |
| **WAPINSKI; and JACK ZAUSA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation ("FDIC") as Receiver for New City Bank ("FDIC-R"), for its Complaint, states as follows:

### I. INTRODUCTION

1. On March 9, 2012, the Illinois Department of Financial and Professional Regulation closed New City Bank, Chicago, Illinois ("New City" or the "Bank"), and appointed the FDIC-R as Receiver. In this lawsuit, FDIC-R seeks to recover damages of at least $6.6 million caused by the negligence, gross negligence, and breaches of fiduciary duty of fourteen former directors and/or officers of the Bank (the "Defendants") when they, among other things, approved thirteen high-risk loans (the "Subject Loans") from March 2006 to September 2008.

2.     Defendants approved the Subject Loans in derogation of their duties to the Bank by failing to inform themselves of material facts necessary to evaluate the merit of each credit decision, including the repayment ability of the borrower, the financial strength of guarantors, and the sufficiency of underlying collateral to protect the Bank in the event of default. Defendants' approval of the Subject Loans violated the Bank's Loan Policy ("Loan Policy") and prudent lending standards. By failing to consider material information and ignoring Loan Policy violations and other underwriting deficiencies when voting to approve loans, Defendants abdicated their responsibilities to ensure that loans were made in accordance with safe and sound banking practices.

3.     Defendants' negligence, gross negligence, and breaches of fiduciary duties in approving the Subject Loans caused damages of not less than $6.6 million.

## II.     THE PARTIES

### A.     Plaintiff

4.     The FDIC is a corporation and an instrumentality of the United States of America, established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1835(a), and the FDIC, when acting as Receiver, is charged with the orderly liquidation of failed banks, 12 U.S.C. § 1821(c)(2)(A)(ii).

5.     As the Bank's receiver, the FDIC-R succeeded to all rights, titles, powers, and privileges of the Bank and, among others, its depositors and accountholders. 12 U.S.C. § 1821(d)(2)(A)(i). Congress specifically authorized the FDIC, when serving as receiver of closed institutions, to pursue claims against directors and officers of failed banks for breach of the applicable duty of care. *See* 12 U.S.C. § 1821(k).

B.     **Defendants**

6.      Albert Baldermann ("Baldermann") was the Bank's Chief Executive Officer ("CEO") from October 2003 until May 2006, and Chairman of the Bank's Board of Directors (the "Board") from October 2003 until November 2009.

7.      Merri Ehrenwerth Baldermann ("Ehrenwerth") was the Bank's President from July 2005 until May 2006, CEO from May 2006 until January 2008, and a member of the Board from July 2005 until November 2009.

8.      William Beavers ("Beavers") was a member of the Board from December 2006 until February 2012.

9.      Peter Bilanzic ("Bilanzic") was a member of the Board from October 2003 until December 2011.

10.     Vincent Cainkar ("Cainkar") was a member of the Board from October 2003 until the Bank closed.

11.     Michael Debre ("Debre") was a loan officer at the Bank from October 2003 until January 2008, and CEO and member of the Board from January 2008 until June 2009.

12.     Ronald Fisher ("Fisher") was a member of the Board from October 2003 until January 2010.

13.     Donald Hartz ("Hartz") was a member of the Board from October 2003 until the Bank closed.

14.     Glenn Krietsch ("Krietsch") was the Bank's President and a member of the Board from May 2006 until June 2009.

15.     Raymond Lazzara ("Lazzara") was a member of the Board from October 2003 until the Bank closed.

16.     Burton Odelson ("Odelson") was a member of the Board from October 2003 until the Bank closed.

17.     Thomas Powell ("Powell") was a member of the Board from October 2003 until the Bank closed.

18.     Gary Wapinski ("Wapinski") was a member of the Board from October 2003 until the Bank closed.

19.     Jack Zausa ("Zausa") was a member of the Board from October 2003 until March 2007.

## III.     JURISDICTION AND VENUE

20.     The Court has subject matter jurisdiction over this matter, as actions in which the FDIC-R is a party are deemed to arise under federal law pursuant to 12 U.S.C. § 1811, *et seq.*, 12 U.S.C. §§ 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345.

21.     This Court has personal jurisdiction over Defendants who were, at all relevant times, residents of and/or conducted business in the State of Illinois.  735 ILCS §§ 5/2-209(a)(1) and (2).

22.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the events and/or omissions giving rise to the claims and causes of action asserted in this Complaint occurred in this district.

## IV.     FACTUAL ALLEGATIONS

### A.     Background

23.     New City was established in 2003, and its original operating plan was to serve the needs of small and mid-sized businesses in downtown Chicago.  Soon after opening, however, the Bank's target lending area expanded, and its commercial real estate ("CRE") loan

concentrations rapidly grew. Much of the Bank's business was referred by Defendants, several of whom were real estate developers or investors as well as borrowers at the Bank.

24.     As Defendants knew, or should have known, CRE lending is a specialized field with unique risks that require thorough understanding and close management. The ability to identify, measure, monitor, and control portfolio risk through effective underwriting and internal controls is crucial to sound CRE lending.

25.     Defendants ignored the proper credit risk management and underwriting practices necessary to ensure that the growth of the Bank's CRE loan portfolio was safe. Defendants' disregard for underwriting standards was exemplified by their approval of the Subject Loans, which were made without proper vetting, despite a lack of crucial information about each loan, and in the face of underwriting deficiencies clear from each loan presentation.

26.     Defendants' reckless lending practices led to a significant increase in classified assets at the Bank. From December 2008 to December 2011, total non-current loans as a percent of total loans rose from 2.42 percent to 27.73 percent, and the Bank was unable to recover from the resulting losses.

**B.**     **The Loan Policy and Approval Process at New City Bank**

27.     Under New City's lending practices, all loans, regardless of the amount, were presented to the full Board for approval. As the individuals who made on-the-merits credit decisions at New City, Defendants were charged with understanding and following the provisions of the Bank's Loan Policy, which was designed to protect the Bank from unsound extensions of credit.

28.     At all relevant times, the Loan Policy listed the following loans as "undesirable":

- Loans lacking defined repayment programs;

- Loans where a borrower's financial information demonstrated an inability repay;

- Loans for a speculative purpose; and

- Loans to parties whose integrity or honesty is questionable.

29. The Loan Policy further warned that "collateral is not the difference between a good loan and a bad loan." Under the Loan Policy, the maximum loan-to-value ("LTV") ratios for CRE loans were 65 percent for raw land loans, 75 percent for development loans, and 80 percent for commercial construction and CRE investment loans; all collateral was to be valued at the lower of cost or market. The Loan Policy also required that a commercial borrower's debt service coverage ("DSC") ratio be, at a minimum, 1.15, including any new debt under consideration. For individual borrowers, each borrower's monthly total debt-to-income ("DTI") ratio was not to exceed 75 percent.

30. The Board met monthly, and usually considered 20-30 loans at each meeting. Loan proposals consisted of a written loan presentation – typically a two- or three-page summary of the credit request – followed by a summary of the borrower's and/or guarantor's financial information. With few exceptions, loan presentations were not provided to Board members in advance of Board meetings. Throughout the relevant period, Board members typically did not have time to review all of the information in a loan presentation prior to voting on the loan under consideration.

31. With respect to each Subject Loan, from the face of the loan presentation, Defendants knew (or should have known, had they taken time to review the presentation) that the proposed loan violated the Loan Policy and prudent lending practices.

**C.** **Defendants' Tortious Approvals That Caused the Bank Losses**

32. The Subject Loans consist of eleven CRE loans and two letters of credit approved from March 2006 to September 2008. The Subject Loans violate multiple provisions of the

Bank's Loan Policy and safe and sound banking practices, including incomplete borrower and guarantor financial information, inadequate DSC and DTI ratios, and insufficient collateral.[1]

**Borrower A**

33.     On March 21, 2006, the Board approved a $1.25 million loan to Borrower A, an individual. All of the Defendants (except Beavers, Debre, and Krietsch, who were not yet on the Board) approved the loan. The stated purpose of the loan was to fund the construction of six residential condominiums and retail space on two vacant lots in Chicago.

34.     The Defendants who approved the loan acted negligently, grossly negligently, and in breach of their fiduciary duties because they, among other things:

a.      Approved the loan despite lacking critical and timely financial information about the borrower. Despite references in the loan presentation to another of Borrower A's CRE projects, the presentation included no global cash flow analysis performed for Borrower A and/or any of her related entities. The loan presentation lists "business income" as a source of repayment on the loan, but no business financial information was provided. The loan presentation included some limited personal financial information for the borrower, but it was at least a year old and therefore stale.

b.      Approved the loan even though the limited personal financial information the loan presentation did contain raised substantial red flags about Borrower A's ability to repay the loan. The loan presentation stated that Borrower A had only $20,511 in liquid assets, and that her net worth of $1.1 million consisted almost entirely of her highly leveraged real estate investments. The loan request lists a monthly DTI

---

[1]  Subject Loans are described using letters to refer to the individual borrowers and guarantors for privacy reasons. The full names of these individual borrowers and guarantors will be disclosed upon the entry of an appropriate protective order.

ratio of 45 percent for Borrower A, but this ratio did not include the required monthly interest payments on the loan under consideration. With required payments on the proposed debt included, Borrower's monthly debt payment requirements exceeded her monthly income, in violation of the Loan Policy.

c. Approved the loan despite the fact that the loan proceeds would cover 95 percent of the construction costs, such that there was no buffer for cost overruns or for delays in construction time or while the collateral was on the market.

d. Failed to require a guarantor or co-borrower on the loan, even though Borrower A did not demonstrate an ability to repay the loan.

e. Approved the loan without any pre-sales or pre-leases on the proposed condominiums or retail spaces, making this a speculative, undesirable loan under the Loan Policy.

f. Approved the loan despite lacking critical information regarding the underlying collateral. The loan request contained no information about the proposed timeline or feasibility of the construction project. The loan presentation stated that the projected "as completed" value of the collateral was $1.773 million, but provided no information about how this figure was derived and whether it should be discounted for LTV ratio calculations. Under the Loan Policy, Defendants should have considered the "cost" value of the as-completed collateral, which an October 2005 appraisal available to Defendants found was $1.364 million, making the LTV ratio 92 percent, in excess of regulatory guidance and the LTV limits in the Loan Policy.

35. The loan was renewed and increased to $1.32 million in June 2007, and renewed and increased to a final loan amount of $1.488 million in March 2008.

36. The FDIC-R seeks damages in excess of $1.128 million caused by Defendants' tortious approval of the loan to Borrower A.

## Borrowers B-1 and B-2

### June 2006 Loan

37. On June 20, 2006, the Board approved a $1.06 million loan to Borrower B-1 and Borrower B-2, two limited liability companies owned by Principal B, who also served as a co-borrower on the loan. All of the Defendants (except Beavers and Debre, who were not yet on the Board, and Wapinski, who was absent) approved the loan. The stated purpose of the loan was for "working capital" for the borrowers.

38. The Defendants who approved the loan acted negligently, grossly negligently, and in breach of their fiduciary duties because they, among other things:

a. Approved the loan despite lacking critical information regarding the use of the funds. The loan presentation stated that this loan was to be repaid from the eventual sale of residential lots, which had been partially developed with funds from a $2.3 million loan held at another institution. The loan presentation listed working capital as the loan's purpose, but contained no discussion of the planned use of the funds, the development tasks needed to make the lots marketable, or the projected timeline for completion of development and marketing.

b. Approved the loan even though they knew Principal B's integrity and honesty were questionable, in violation of the Loan Policy. The loan presentation advised that Principal B had credit problems in the past. Defendant Wapinski, who had been involved in a real estate project in the same geographic area as Principal B, had previously warned the approving Defendants that Principal B was not credible and lacked integrity.

c.     Approved the loan despite lacking critical financial information on the borrower. Despite references in the loan presentation to other real estate projects of the borrowers, the presentation included no global cash flow analysis for Principal B and his related entities.

d.     Approved the loan even though the inadequate financial information the loan presentation did contain raised substantial red flags regarding the borrowers' ability to repay the loan. The loan presentation provided to the Board advised that Borrower B-2 and Principal B had incomes that had decreased substantially over the prior three years. Principal B listed a net worth of $12 million, but the financial summary included in the loan presentation showed this net worth consisted almost entirely of real instate investments. Further, $9.5 million of Principal B's claimed assets was his investment in Borrower B-2, a valuation contradicted by Borrower B's own financial summary, which noted that its $4.2 million in assets were offset by $3.7 million in liabilities. No financial information was provided for Borrower B-1, which was a new entity.

e.     Approved the loan despite lacking critical information regarding the underlying collateral. New City took a second mortgage on the 10.8 acre parcel in Frankfort, Illinois, that was to be developed into lots, behind the still outstanding $2.3 million development loan from another institution. The loan presentation stated that the appraised as-completed value of the property was $4.2 million, but cited no further information about the underlying appraisal, including when the appraisal was completed or whether the $4.2 million figure was a retail value rather than a cost value.

10

**September 2008 Loan**

39.     On September 23, 2008, the Board approved a loan of $2.87 million to Borrower B-1 to pay off the $1.06 million working capital loan, take over the development loan that the borrower held at the lead institution, and create an interest reserve.  All of the Defendants (except Zausa, who was no longer on the Board) approved the loan.

40.     The Defendants who approved the loan acted negligently, grossly negligently, and in breach of their fiduciary duties because they, among other things:

a.      Exposed the Bank to additional risk by providing $1.81 million in new funds for the underlying real estate project, which had not sold any lots since the development was completed two years earlier.  The bank in the first mortgage position on the project took a $600,000 charge-off and a $400,000 unsecured loan from Principal B in order to exit from the credit, determining that it was more prudent to recognize an impairment of $1 million rather than remain in the project.  The approving Defendants, in contrast, increased New City's investment in the project from $1.06 million to $2.87 million at a time when, as the loan presentation warned, there was a "reduced demand for vacant lots in Frankfort" and repayment was "predicated on sales of the vacant lots."

b.      Approved the loan despite lacking critical financial information regarding the borrower and guarantor.  No financial information was provided for the borrower. To support the request for funds, Principal B, who was a guarantor on the loan, submitted a personal financial statement ("PFS") from February 2008, in which he claimed his net worth was approximately $50 million – $30 million more than claimed in 2006.  Despite this dramatic alleged increase and an admission in the loan presentation that the real estate values listed in the PFS had likely declined

11

since the statement had been completed, updated and more complete information was not considered.

c.     Relied on the borrower's self-reported net worth in approving the loan, even though they knew Principal B's integrity and honesty were questionable.

d.     Approved the loan despite lacking critical information regarding the collateral taken on the loan. The 2008 loan presentation used the stale collateral valuation from the 2006 loan presentation, and there was no estimate of current value or discussion of any discounting for expected additional time on the market and the drastic fall in real estate values in the area.

41.     The loan was placed on the Bank's watch list immediately after it was funded, and the Bank charged off $2.088 million of the loan in 2010.

42.     The FDIC-R seeks damages in excess of $2.673 million caused by Defendants' tortious approval of the loans to Borrowers B-1 and B-2.

### Borrower C

43.     On November 21, 2006, the Board approved a $700,000 loan to Borrower C, a limited liability company owned by five principals. All of the Defendants (except Beavers and Debre, who were not yet on the Board) approved the loan. The stated purpose of the loan was to fund construction of two three-unit apartment buildings in Chicago, Illinois.

44.     The Defendants who approved the loan acted negligently, grossly negligently, and in breach of their fiduciary duties because they, among other things:

a.     Approved the loan despite lacking critical financial information on the borrower. The loan presentation contained no financial information about the borrower.

b.     Failed to perform or insist upon a global cash flow analysis for the borrower and guarantors. Despite a noted weakness in the loan presentation that the borrower

"has numerous speculative projects in progress" and references to existing loan commitments of the guarantors, no global cash flow analysis was performed for Borrower C, its principals, and any of their related entities.

c.      Approved the loan despite a note on the face of the loan presentation that the "speculative nature of the project" was a weakness, making this loan undesirable under the Loan Policy.

d.      Approved the loan even though the information provided regarding the collateral contained substantial red flags, indicating that this loan should not be approved. The loan presentation presented three values for the underlying collateral: an "as is" value of $100,000; an "as completed" retail value of $890,000; and a "cost" value of $817,975. Defendants used the retail value to determine LTV, in violation of the Loan Policy. When the proper cost value is considered, the LTV ratio is in excess of regulatory guidance and the limits in the Loan Policy.

45.     The loan was renewed and increased to $744,000 in July 2007, and recognized by the Bank as impaired in 2010.

46.     The FDIC-R seeks damages in excess of $637,000 caused by Defendants' tortious approval of the loan to Borrower C.

## Borrower D

47.     On December 19, 2006, the Board approved a $480,000 loan to Borrower D, a limited liability company owned by Principal D. All of the Defendants (except Debre, who was not yet on the Board) approved the loan. The stated purpose of the loan was for the purchase of a seven-unit strip mall in Chicago, Illinois.

48.     The Defendants who approved the loan acted negligently, grossly negligently, and in breach of their fiduciary duties because they, among other things:

13

a.　　Approved the loan even though the primary repayment source was insufficient to cover the loan payments. The loan presentation identified current rental income as the primary repayment source for this loan, yet the current annual rental profit was $43,562, while the yearly minimum loan payments were $45,360. The loan presentation warned that the resulting DSC ratio was 0.96, well below the 1.15 minimum DSC ratio required by the Loan Policy.

b.　　Approved the loan despite lacking critical financial information on the borrower and guarantor. The loan presentation contained no financial information for the borrower, which was a new entity created by Principal D. The loan presentation listed the income of Principal D as a secondary repayment source. With this loan, Principal D was a guarantor on over $1.3 million in loans at New City, in addition to carrying investment property loans at other institutions. Despite these references to Principal D's other commitments and the reliance on his "business income" as a repayment source, the approving Defendants did not require or consider a global cash flow analysis of Principal D and his related entities.

c.　　Approved the loan despite lacking critical information regarding the collateral taken on the loan. The loan presentation listed the value of the underlying collateral as $600,000, yet it contained no analysis of the neighborhood, area demographics, or saturation in the commercial real estate market should sale of the collateral become necessary to repay this loan.

49.　　The loan was recognized by the Bank as impaired in 2009.

50.　　The FDIC-R seeks damages in excess of $220,000 caused by Defendants' tortious approval of the loan to Borrower D.

**Borrower E**

51.     On November 27, 2007, the Board approved a $470,000 loan to Borrower E, an individual.  All of the Defendants (except Debre, who was not yet on the Board, and Zausa, who had left the Board) approved the loan.  The stated purpose of the loan was to refinance a troubled mortgage loan for a twelve-unit apartment building in Chicago and provide a reserve for initial interest payments on the loan.

52.     The Defendants who approved the loan acted negligently, grossly negligently, and in breach of their fiduciary duties because they, among other things:

a.      Approved the loan even though the primary repayment source was insufficient to cover the loan payments.  The loan presentation identified current rental income as the primary repayment source for this loan, yet the current annual rental profit was $41,863, while the yearly minimum loan payments were $44,370.  The loan presentation warned that the resulting DSC ratio was 0.94, well below the 1.15 minimum DSC ratio required by the Loan Policy.

b.      Approved the loan despite substantial red flags indicating that the borrower was not credit-worthy and the loan should not be approved.  The borrower allowed the underlying mortgage loan to fall into foreclosure with the prior lender, calling into question his ability or willingness to make payment on this proposed refinanced loan.  The borrower's DTI ratio was 98 percent, in violation of the Loan Policy, and the borrower showed only $4,500 in liquid assets.

c.      Failed to require a guarantor for the loan despite the fact that the borrower did not demonstrate an ability to repay the loan.

d.      Approved the loan despite lacking critical information regarding the collateral that served as security for the loan.  The loan request identified the collateral value as

15

the only strength of the credit. However, the loan request relied on an appraisal value that was more than a year old in a steeply declining real estate market.

53.     The loan was renewed in August 2009, and was recognized by the Bank as impaired in 2010.

54.     The FDIC-R seeks damages in excess of $466,864 caused by Defendants' tortious approval of the loan to Borrower E.

## Borrower F

55.     New City made a number of loans to Borrower F, an individual real estate investor.

## May 2006 Acquisition and Construction Loan

56.     On May 23, 2006, the Board approved a $502,600 loan to Borrower F. All of the Defendants (except Beavers and Debre, who were not yet on the Board) approved the loan. The stated purpose of the loan was to acquire a condominium in a multi-unit building, and to renovate it and two other previously purchased condominiums in the same building.

57.     The Defendants who approved the loan acted negligently, grossly negligently, and in breach of their fiduciary duties because they, among other things:

a.      Approved the loan despite lacking critical financial information on the borrower. Defendants failed to perform or insist upon a global cash flow analysis for the borrower despite references in the loan presentation regarding his other open real estate projects and loans held at New City and other institutions.

b.      Approved the loan even though the limited financial information the loan presentation did contain raised substantial red flags regarding the borrower's ability to repay the loan. The loan presentation noted that Borrower F's DTI ratio

16

was a weakness of the credit, and the financial summary showed that his net worth was made up almost entirely of illiquid real estate investments.

c.     Failed to require a guarantor even though the borrower did not demonstrate an ability to repay the loan.

d.     Approved the loan even though the information that was provided regarding the collateral raised substantial red flags regarding the security for the loan. The $518,000 wholesale value of the collateral resulted in a LTV ratio of 97 percent, in violation of the Loan Policy. The loan presentation warned that this LTV ratio was in excess of regulatory guidelines.

e.     Approved the loan despite lacking critical information about one of the proposed repayment sources. Speculative rental income was identified as a source of repayment on the loan, but there was no projected rental income discussed.

58.     The Board renewed and increased this loan to $562,600 in June 2007.

59.     The FDIC-R seeks damages in excess of $424,000 caused by Defendants' tortious approval of the May 2006 loan to Borrower F.

**November 2006 Commercial Mortgage Loan**

60.     On November 21, 2006, the Board approved a $145,000 loan to Borrower F. All of the Defendants (except Beavers and Debre, who were not yet on the Board) approved the loan. The stated purpose of the loan was to refinance a commercial mortgage loan held by Borrower F at another institution.

61.     The Defendants who approved the loan acted negligently, grossly negligently, and in breach of their fiduciary duties because they, among other things:

17

a.    Approved the loan despite lacking critical financial information on the borrower. Defendants failed to perform or insist upon a global cash flow analysis for the borrower despite references in the loan presentation regarding his other open real estate projects and loans held at New City and at other institutions.

b.    Approved the loan even though the limited financial information the loan presentation did contain raised substantial red flags regarding Borrower F's ability to repay the loan.  The loan presentation noted that Borrower F's DTI was still a weakness, and his assets continued to consist of illiquid real estate holdings.

c.    Failed to require a guarantor for the loan even though the borrower did not demonstrate an ability to repay the loan.

d.    Approved the loan despite lacking critical information regarding the collateral that served as security for the loan.  The loan presentation relied on an unverified collateral value; there was no updated appraisal value provided or considered for the underlying collateral.

e.    Approved the loan despite red flags about the viability of the primary repayment source.  Speculative rental income from a vacant garden-level apartment in a three-unit property was identified as the primary repayment source.  The loan presentation warned that the other two units on the property were also vacant. Defendants initially conditioned their approval on Borrower F securing a lease for the property, but later released this requirement and increased the loan approval amount to $147,000 for Borrower F to pay off business debt and fund an interest reserve, even though no development or construction was contemplated.

62.    The FDIC-R seeks damages in excess of $142,000 caused by Defendants' tortious approval of the November 2006 loan to Borrower F.

18

**January 2007 Acquisition Loan**

63.     On January 24, 2007, the Board approved a $496,000 loan to Borrower F.  All of the Defendants (with the exception of Debre, who was not yet on the Board, and Hartz, who was absent) approved the loan.  The stated purpose of the loan was to acquire a six-unit apartment building.

64.     The Defendants who approved the loan acted negligently, grossly negligently, and in breach of their fiduciary duties because they, among other things:

a.      Approved the loan even though the primary repayment source was insufficient to cover the loan payments.  The loan presentation identified current rental income as the primary repayment source for this loan, yet the reported annual rental profit was $39,427, while the yearly minimum loan payments were $44,724.  The loan presentation warned that the resulting DSC ratio was 0.88, well below the 1.15 minimum DSC ratio required by the Loan Policy.

b.      Failed to consider critical financial information on the borrower.  Defendants failed to perform or insist upon a global cash flow analysis for the borrower despite references in the loan presentation regarding other open real estate projects and loans held at New City and at other institutions, and despite knowing that New City's commitment in Borrower F's projects more than doubled over the prior year.  The loan presentation claimed that Borrower F's DTI ratio had dropped to 29 percent, but the financial summary showed that this figure failed to take into account payments due on $1.7 million in loans.

c.      Failed to require a guarantor for the loan even though the borrower did not demonstrate an ability to repay the loan.

d.   Approved the loan despite lacking critical information regarding the collateral that served as security for the loan.  The loan presentation lists the value of the underlying collateral as $620,000; however, it contained no neighborhood analysis, discussion of area demographics, or consideration of the saturated commercial real estate market should sale of the collateral become necessary to repay the loan.

65.   The FDIC-R seeks damages in excess of $281,000 caused by Defendants' tortious approval of the January 2007 loan to Borrower F.

**Borrowers G-1 and G-2**

66.   New City made a number of loans to Borrowers G-1 and G-2, a married couple who were real estate investors.

**July 2006 Loan**

67.   On July 18, 2006, the Board approved a $400,000 loan to Borrowers G-1 and G-2. All of the Defendants (except Beavers and Debre, who were not yet on the Board, and Odelson, who was absent) approved the loan.  The stated purpose of the loan was to refinance commercial mortgages held on nine condominiums in a thirteen-unit building.

68.   The Defendants who approved the loan acted negligently, grossly negligently, and in breach of their fiduciary duties because they, among other things:

a.   Approved the loan despite lacking critical financial information on the borrowers.  Despite references in the loan presentation to the borrowers' outstanding guarantees and loans to related entities at New City, as well as over $7 million in investment property mortgages at other institutions, the presentation contained no global cash flow analysis performed for the borrowers or their related entities.

20

b.      Approved the loan even though the limited financial information on the borrowers in the loan presentation raised substantial red flags regarding the borrowers' ability to repay the loan.  The loan presentation stated that the borrowers' income over the past three years had been steadily decreasing, the most recent year showing a negative income of ($549,596).  The presentation showed that no income was available to service the borrowers' monthly debt, a violation of the Loan Policy.  The borrowers claimed a large net worth, but the financial summary in the loan presentation showed that this net worth consisted of illiquid real estate investments.  The borrowers had dangerously low credit scores of 563 and 621, and the loan presentation warned that the borrowers had seven outstanding judgments against them.

c.      Failed to require a guarantor for the loan even though the borrowers did not demonstrate an ability to repay the loan.

d.      Approved the loan despite lacking critical information regarding the collateral that served as security for the loan.  New City was to take a first mortgage on nine of the units, and a second mortgage on the remaining four units in the building.  The aggregate "retail" value of the collateral was estimated from appraisals performed by another institution.

e.      Approved the loan without considering critical information and in the face of red flags about the primary repayment source.  Even though rental information was identified as the primary repayment source, the loan presentation contained no information regarding rental vacancies or rental

income projections.  The only rental information presented was the borrowers' rental income/loss for 2004, which was a loss of $140,814.

**November 2007 Loan**

69.     On November 27, 2007, the Board approved a $40,000 loan to Borrowers G-1 and G-2.   All of the Defendants (except Debre, who was not yet on the Board, and Zausa, who had left the Board) approved the loan.  The stated purpose of the loan was "cash out" to the borrowers for business expenses.

70.     The Defendants who approved the loan acted negligently, grossly negligently, and in breach of their fiduciary duties because they, among other things:

      a.      Approved the loan despite lacking critical financial information on the borrowers.  Despite references in the loan presentation to the borrowers' outstanding guarantees and loans to related entities at New City, as well as over $9 million in investment property mortgages at other institutions, the presentation contained no global cash flow analysis performed for the borrowers or their related entities.

      b.      Approved the loan even though the limited financial information on the borrowers in the loan presentation raised substantial red flags regarding the borrowers' ability to repay the loan.  The borrowers continued to have low credit scores and carry outstanding judgments.  The borrowers claimed a large net worth, but the financial summary in the loan presentation showed that this net worth consisted of illiquid real estate investments.  The loan presentation further showed that when the borrowers' depreciation income is removed, their combined personal, business, and rental incomes remained negative.

c. Failed to require a guarantor for the loan even though the borrowers did not demonstrate an ability to repay the loan.

d. Approved the loan without taking any new collateral in the event of default, instead cross-collateralizing the property that already served as collateral on other loans to the borrowers, placing further strain on the credit relationship.

e. Approved the loan without considering critical information and in the face of red flags about the primary repayment source. Even though rental information was identified as the primary repayment source, the loan presentation contained no information regarding rental vacancies or rental income projections. The only rental information presented was the borrowers' rental income/loss for 2006, which was a loss of $220,311.

**April 2008 Letters of Credit**

71. On April 29, 2008, the Board approved two letters of credit in support of Borrower G-1 and Borrower G-2. All of the Defendants (except Zausa, who had left the Board) approved the letters of credit. One letter was for the benefit of Guaranty National Title in the amount of $306,000, and the other letter was for the benefit of Fifth Third Bank in the amount of $249,000.

72. The Defendants who approved the letters of credit acted negligently, grossly negligently, and in breach of their fiduciary duties because they, among other things:

a. Approved the credits without considering critical information about the underlying purpose of the letters of credit. The loan presentation provided that should either beneficiary draw upon its letter of credit from New City, then New City would pay the beneficiary by "activating" a line of credit

23

with Borrowers G-1 and G-2 listed as the borrowers. The loan presentation contained no information about what conduct or performance the letters of credit were guaranteeing or securing, or what events might trigger the beneficiaries' demand for payment.

b. Approved the letters of credit even though the limited financial information on the borrowers in the loan presentation raised substantial red flags regarding the borrowers' ability to repay any lines of credit should they be necessary to satisfy either beneficiary's demand for payment. The Loan Presentation advised that the borrowers' loans and guarantees at New City had grown to over $3 million. The remainder of the borrowers' financial information had not been updated from the prior year, and suffered from the same deficiencies present earlier. The borrowers continued to carry outstanding judgments against them.

c. Failed to require a guarantor should the letters of credit be drawn upon, even though the borrowers did not demonstrate an ability to repay in that event.

d. Approved the letters of credit without taking any new collateral from the borrowers, instead cross-collateralizing the property that already served as collateral on other New City loans to the borrowers, placing further strain on the credit relationship.

73. The letters of credit were both drawn upon in 2009, and two lines of credit listing Borrower G-1 and Borrower G-2 as the borrowers were activated to make the requisite payments on the letters of credit.

24

The FDIC-R seeks damages in excess of $630,000 related to Defendants' approvals of the four loans to Borrowers G-1 and G-2.

## V. CLAIMS FOR RELIEF

### COUNT I
### Negligence (Illinois law)
### [IN THE ALTERNATIVE TO COUNT III]

74. Plaintiff FDIC-R re-alleges and incorporates by reference each of the allegations contained in paragraphs 1 through 73 of this Complaint as though fully set forth herein.

75. By their actions and inactions, Defendants were negligent in failing to perform their respective duties with the requisite degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances.

76. Defendants owed a duty to use reasonable care, skill, and diligence in the performance of their duties, including but not limited to the following: (a) informing themselves about proposed transactions and their risks before approving them; (b) approving only those loans that conformed with the Loan Policy; (c) ensuring that any loans they approved were underwritten in a safe and sound manner; (d) ensuring that any loans they approved were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize risk; (e) ensuring that any loans they approved were made to creditworthy borrowers; and (f) ensuring that any transactions they approved did not violate applicable banking laws and regulations.

77. Defendants were negligent by their actions and inactions, including but not limited to the following: (a) failing to inform themselves about the Subject Loans and their risks before approving them; (b) approving the Subject Loans on terms that violated the Loan Policy; (c) failing to ensure that the Subject Loans were underwritten in a safe and sound manner before approving them; (d) failing to ensure that the Subject Loans were secured by sufficiently

valuable collateral and guarantees in order to prevent or minimize risk; (e) approving the Subject

Loans to borrowers who were not creditworthy; (f) failing to ensure that the Subject Loans did

not violate applicable banking laws and regulations; and (g) approving the Subject Loans

without proper analysis of the borrower's ability to satisfy the debt.

78.     Defendants are not entitled to the application of the business judgment rule

because Defendants failed to exercise due care, and because each of Defendant's actions or

inactions were taken without Defendants sufficiently informing themselves of material facts

necessary to properly exercise their business judgment.

79.     As a direct and proximate result of Defendants' negligence, the FDIC-R seeks

damages in an amount to be proven at trial in excess of $6.6 million.

## COUNT II
## Gross Negligence – Violation of 12 U.S.C. §1821(k)

80.     Plaintiff FDIC-R re-alleges and incorporates by reference each of the allegations

contained in paragraphs 1 through 73 of this Complaint as though fully set forth herein.

81.     Section 1821(k) of Financial Institutions Reform, Recovery and Enforcement Act

holds directors or officers of financial institutions personally liable for damages caused by their

"gross negligence," as defined by applicable state law.  Illinois law defines gross negligence as

"very great negligence," but something less than willful, wanton, and reckless conduct.

82.     Defendants owed a duty to use reasonable care, skill, and diligence in the

performance of their duties, including but not limited to the following:  (a) informing themselves

about proposed transactions and their risks before approving them; (b) approving only those

loans that conformed with the Loan Policy; (c) ensuring that any loans they approved were

underwritten in a safe and sound manner; (d) ensuring that any loans they approved were secured

by sufficiently valuable collateral and guarantees in order to prevent or minimize risk;

(e) ensuring that any loans they approved were made to creditworthy borrowers; and (f) ensuring that any transactions they approved did not violate applicable banking laws and regulations.

83.     Defendants were grossly negligent by their actions and inactions, including but not limited to the following:  (a) failing to inform themselves about the Subject Loans and their risks before approving them; (b) approving the Subject Loans on terms that violated the Loan Policy; (c) failing to ensure that the Subject Loans were underwritten in a safe and sound manner before approving them; (d) failing to ensure that the Subject Loans were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize risk; (e) approving the Subject Loans to borrowers who were not creditworthy; (f) failing to ensure that the Subject Loans did not violate applicable banking laws and regulations; and (g) approving the Subject Loans without proper analysis of the borrower's ability to satisfy the debt.

84.     As a direct and proximate result of Defendants' gross negligence, the FDIC-R seeks damages in an amount to be proven at trial in excess of $6.6 million.

## COUNT III
### Breach of Fiduciary Duty (Illinois law)
### [IN THE ALTERNATIVE TO COUNT I]

85.     Plaintiff FDIC-R re-alleges and incorporates by reference each of the allegations contained in paragraphs 1 through 73 of this Complaint as though fully set forth herein.

86.     As directors and/or officers, Defendants owed the Bank fiduciary duties to act with the utmost care and in the best interests of the Bank, including but not limited to the following:  (a) informing themselves about proposed transactions and their risks before approving them; (b) approving only those loans that conformed with the Loan Policy; (c) ensuring that any loans they approved were underwritten in a safe and sound manner; (d) ensuring that any loans they approved were secured by sufficiently valuable collateral and

guarantees in order to prevent or minimize risk; (e) ensuring that any loans they approved were made to creditworthy borrowers; and (f) ensuring that any transactions they approved did not violate applicable banking laws and regulations.

87.     Defendants breached their fiduciary duties by their actions and inactions, including but not limited to the following:  (a) failing to inform themselves about the Subject Loans and their risks before approving them; (b) approving the Subject Loans on terms that violated the Loan Policy; (c) failing to ensure that the Subject Loans were underwritten in a safe and sound manner before approving them; (d) failing to ensure that the Subject Loans were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize risk; (e) approving Subject Loans to borrowers who were not creditworthy; (f) failing to ensure that the Subject Loans did not violate applicable banking laws and regulations; and (g) approving the Subject Loans without proper analysis of the borrower's ability to satisfy the debt.

88.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the FDIC-R seeks damages in an amount to be proven at trial in excess of $6.6 million.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the FDIC as Receiver for New City Bank, requests entry of judgment in its favor against Defendants as follows:

a.     For compensatory damages of at least $6.6 million, and any excess amount as may be proved at trial, with each Defendant found jointly and severally liable for the losses on the Subject Loans he or she approved;

b.     For its cost of suit against all Defendants;

c.     For prejudgment interest;

d.     For attorneys' fees and costs for the investigation and litigation; and

e.    For such other and further relief as this Court deems just and proper.

## VII.    JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 28, the FDIC-R requests a trial by jury on all

claims.

Respectfully submitted,

**FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
NEW CITY BANK**

Dated:  March 6, 2015              _/s/  *Lydia A. Bueschel*_____
                                   One of its Attorneys


Lydia A. Bueschel (ARDC No. 6274638)
Susan Valentine  (ARDC No. 6196269)
Sam Sedaei (ARDC No. 6317657)
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100 – Telephone
(312) 663-0303 – Facsimile
lbueschel@robinsoncurley.com
svalentine@robinsoncurley.com
ssedaei@robinsoncurley.com